[Civ. No. 43417. Second Dist., Div. Five. Mar. 24, 1975.]

ANASTASIO MARTINEZ, Plaintiff and Appellant, v.
PERLITE INSTITUTE, INC., Defendant and Respondent.

[redacted]

COUNSEL

Margolis, McTernan, Smith, Scope & Sacks and Elizabeth B. Spector for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Lee G. Paul and Geoffrey L. Thomas for Defendant and Respondent.

OPINION

**HASTINGS, J.**—This is an appeal from an order of the superior court granting the motion of defendant Perlite Institute to quash service of summons for lack of jurisdiction.

The appeal comes to us on an engrossed settled statement (statement). A summary of the facts as set forth in the statement and found in the exhibits attached thereto is as follows:

Plaintiff-appellant Anastasio Martinez (Martinez) was an employee of Redco, a California corporation engaged in the manufacture of expanded perlite (a volcanic glass ore). Redco is a member of Perlite Institute, defendant-respondent (Institute), a New York corporation with its principal and only place of business in New York City. Redco pays Institute between $3,000 and $4,000 annually in dues. The amount paid is based on the tonnage of perlite ore used by Redco each year. Institute has approximately 57 members in 19 states, and 17 nations of the world. Three members are located in California. Institute functions as a trade association and is not engaged in the manufacture, sale or distribution of perlite ore; however, it acts as a clearing house of information with regard to uses and the nature of perlite. It also makes available to members information with regard to potential purchasers of perlite who are located within the member's geographical area.

Institute, at time of hearing on the motion to quash, had never owned property in California; nor had an office or place of business; maintained a bank account; consented to jurisdiction; appointed an agent or employee; maintained any books or records; or transacted any business in this state.

In January 1971, Institute, by mail communication, offered to test a sample of perlite ore used by its members, to determine among other things the amount of free silica (a toxic material) contained in the sample. The testing was performed for Institute by McCrone Associates in Chicago, Illinois. Redco accepted the offer and sent a sample of its perlite ore to McCrone. Tests were made and the results were sent by McCrone directly to Institute in New York, who in turn advised Redco of the chemical analysis by letter dated February 5, 1971.[1]

---

[1]This letter read as follows:

PERLITE INSTITUTE INC.
*45 West 45th Street/New York, N.Y. 10096 212-265-2145*

February 5, 1971

Mr. Edgar K. Hill
Redco, Inc.
11831 Vose Street
North Hollywood, California 91605

Dear Kim:

Enclosed is the report from McCrone Associates entitled DETERMINATION OF FREE

Redco does not employ an industrial chemist, nor does it test the raw perlite ore when it is received. The deposition of Edgar K. Hill, president of Redco, is attached as an exhibit to the statement. He testified that approximately a year and a half before his deposition, a chemical laboratory sponsored by Institute made a test of both the perlite raw ore and the expanded material to determine whether it contained any harmful materials.[2] In response to the question, "[w]ould you say your company relies on the Perlite Institute?" he said, "I would say to a great degree, but not solely. We also rely on the fact that testing has been done by other organizations that have never indicated anything harmful." He

---

SILICA IN PERLITES.

Samples submitted by your company had the following free silica content:

Weight Percentage Concentration

| | X-ray method<br>quartz | Microscopical method<br>total free silica |
|---|---|---|
| ore | 0.5 | ND* |
| expanded | < 0.5 | < 0.05 |

*ND = not determined

While this study provides current data on the free silica content of ores and perlite products, it does not define the worker's environmental experience. One might conclude that a perlite ore containing 5% quartz is ten times more hazardous than one containing 0.5% quartz. This is, of course, potentially erroneous and misleading. One should consider only those particle sizes of quartz which are respirable. In addition, there may be only certain production operations which generate enough respirable quartz dust to require safety gear or control systems. If you have any questions, we would be happy to hear from you.

Your cooperation in this project is greatly appreciated.

Very truly yours,

PERLITE INSTITUTE, INC.

[Signed] Frank

Frank M. Coda
Managing Director

Received
Feb 8, 1971

FMC:rm
Attachment - 1

*International Association of Perlite Producers*

[2]It is not clear from the deposition whether this was the test made by McCrone in early 1971, but it most likely is.

further testified that Institute had sent out a questionnaire to every known producer of perlite ore and processor of perlite, asking if they knew of any history of pulmonary problems among their personnel. The results were published and they indicated not a single case of any pulmonary problem, or any problem relating to perlite, had been reported.

■ Martinez' complaint purports to be a class action suit for himself and all other employees similarly situated in Los Angeles County, State of California. It alleges negligence, strict liability, and breach of warranty against Institute. Martinez contends that perlite ore, when heated, releases dangerous toxic materials, which in turn were inhaled by Redco's employees, thereby causing them serious physical injury. The principal cause of action against Institute is that it made false or negligent representations to Redco relating to the relative safety of perlite ore and expanded perlite. That these representations caused Redco to reasonably rely on the safety of the product and led Redco to refrain from taking precautionary measures to protect their workers from the dangers of free silica.[3]

## ISSUE ON APPEAL

Martinez contends that Institute's contacts with the State of California are constitutionally sufficient to support jurisdiction over it in his cause of action arising out of these contacts.

## DISCUSSION

Section 410.10 of the Code of Civil Procedure provides: "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."[4]

*Internat. Shoe Co.* v. *Washington,* 326 U.S. 310 [90 L.Ed. 95, 66 S.Ct. 154, 161 A.L.R. 1057], and *McGee* v. *International Life Ins. Co.,* 355 U.S. 220 [2 L.Ed.2d 223, 78 S.Ct. 199], contained decisional law that was instrumental in motivating the Legislature to adopt section 410.10. Particularly appropriate is language found on pages 222-223 of *McGee* [2

[3]This opinion does not concern itself with the validity of Martinez' cause of action. The only issue presented by this appeal is whether it was proper, as a matter of law, for the court to quash service of summons—whether the complaint is subject to demurrer is not before us. We have based our opinion only on the pertinent facts set forth in the parties' agreed statement and its exhibits.

[4]Enacted in 1969 and operative July 1, 1970.

L.Ed.2d on pages 225-226], where the court said: "Since *Pennoyer* v. *Neff*, 95 U.S. 714, this Court has held that the Due Process Clause of the Fourteenth Amendment places some limit on the power of state courts to enter binding judgments against persons not served with process within their boundaries. But just where this line of limitation falls has been the subject of prolific controversy, particularly with respect to foreign corporations. In a continuing process of evolution this Court accepted and then abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over such corporations. See Henderson, The Position of Foreign Corporations in American Constitutional Law, c. V. More recently in *International Shoe Co.* v. *Washington*, 326 U.S. 310, the Court decided that 'due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Id.*, at 316.

"Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."

Significantly Judicial Council comments to section 410.10 in part state: "Section 410.10 permits California courts to exercise judicial jurisdiction *on any basis* not inconsistent with the state or federal Constitutions. This authorization continues the California law on jurisdiction over foreign corporations and reestablishes the prior law that once governed nonresident individuals.

"All the recognized bases of judicial jurisdiction are included. . . . [¶] In the case of corporations . . . such bases currently include . . . doing business in a state, doing an act in a state, *causing an effect in a state by an act or omission elsewhere* . . ." (Italics added.)

In *Buckeye Boiler Co.* v. *Superior Court,* 71 Cal.2d 893, beginning on page 898 [80 Cal.Rptr. 113, 458 P.2d 57], the court states: "A defendant not literally 'present' in the forum state may not be required to defend itself in that state's tribunals unless the 'quality and nature of the defendant's activity' in relation to the particular cause of action makes it fair to do so. [Citations.] Such a defendant's activity must consist of 'an act done or transaction consummated in the forum State' or 'some [other] act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws.' [Citation.] Furthermore, unless the defendant's forum-related activity reaches such extensive or wide-ranging proportions as to make the defendant sufficiently 'present' in the forum state to support jurisdiction over it concerning causes of action which are unrelated to that activity [citation], the particular cause of action must arise out of or be connected with the defendant's forum-related activity. [Citations.]

"Once it is established that the defendant has engaged in activity of the requisite quality and nature in the forum state and that the cause of action is sufficiently connected with this activity, the propriety of an assumption of jurisdiction depends upon a balancing of the inconvenience to the defendant in having to defend itself in the forum state against both the interest of the plaintiff in suing locally and the interrelated interest of the state in assuming jurisdiction. [Citations.]"

*Fisher Governor Co.* v. *Superior Court,* 53 Cal.2d 222 [1 Cal.Rptr. 1, 347 P.2d 1], sets forth relevant factors to be considered by the court in determining the interest of the forum state in providing an effective means of redress for its citizens. They are: (1) "The interest of the state in providing a forum for its residents [citation] or in regulating the business involved [citation];" (2) "[T]he relative availability of evidence and the burden of defense and prosecution in one place rather than another [citations];" (3) "[T]he ease of access to an alternative forum [citation];" (4) "[T]he avoidance of multiplicity of suits and conflicting adjudications [citations];" (5) "[A]nd the extent to which the cause of action arose out of defendant's local activities [citations]." (*Id.* at pp. 225-226.)

With these principles in mind, we turn to the arguments of the parties.

## ARGUMENT

We begin with Institute's argument because in the answer we find the solution. Basically, Institute contends it is a nonprofit organization

whose activities are so negligible in California that they do not satisfy the constitutional standard of "minimal contacts" that are prerequisite to the exercise of jurisdiction over it.[5] Of note is a portion of Institute's argument before the trial court that if such activities constitute doing business in California, Institute as a nonprofit organization will be exposed to litigation in any state in which it has members which will hinder its capacity to carry on its encouragement of research and investigation and other promotional activities.

This was precisely the argument presented in *Mechanical Contractors Ass'n* v. *Mechanical Con. A. of N. Cal.,* 342 F.2d 393, a case that is very persuasive in assisting us in determining the issue here. Briefly, Mechanical Contractors Association of America, Inc. (National) is a national trade association located only in New York. Its members are in various states and are analoguous to "local associations," but are separate entities. Plaintiff, Mechanical Contractors Association of Northern California, Inc. (Local) was "disaffiliated" by National because of a dispute between the two. Local rejected this disaffiliation. National then sent communications to the members of Local and to other members stating that a new association was to be formed in San Francisco under the sponsorship of National. A new corporation was formed for that purpose. Local sued in California to restrain National's activities.

The court held that California had jurisdiction over the action. We repeat appropriate portions of the opinion. On pages 398-400, the court states: "[T]he decisions are clear that even though, in a technical sense, the facts giving rise to the cause of action may have occurred outside of the state, this is not a bar to the assertion of jurisdiction by the state, particularly where there are activities in the state which relate to the cause of action. . . .

"The California courts have made it clear that the term 'doing business in this state' is one that the courts have equated with such minimum contacts with the state that the maintenance of the suit does not offend traditional notions of fair play and substantial justice . . .

". . . The Local argues that those contacts with California which are part of its regular business, as distinguished from those arising from the

---

[5]Institute also argued that it "did not itself perform the chemical analysis on Redco's perlite," therefore, its "only role was to report or publish the results . . . in California." Institute then cites cases establishing that a publishing company is not "doing business" in a state where its publications are merely received. We reject this argument. The record contains sufficient evidence to sustain a prima facie finding that McCrone tested the ore for Institute and was an agent of Institute for that purpose.

Local's internal difficulties, constitute a doing of business by the National in California. The theory is that those activities are precisely the activities which the National was organized to do, and that they are therefore the doing of its business in this state, even though the business may be done largely by mail, (see: McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223), or through the Local affiliate. [Fn. omitted.] *Amici curiae* representing the National Association of Wholesalers and the American Society of Association Executives urge that such activities do not constitute the doing of business within the state, and that to hold that they do would subject every national non-profit association to suit in any state in which it has members or affiliates. We leave the decision of this question to the time when a case may arrive which makes it necessary to decide it.

"Here, there were additional activities by the National, namely, its sponsorship of a rival association, [etc.] . . . These activities relate directly to the cause or causes of action attempted to be stated in the complaint. They are the carrying out in California of one of the objectives of the National as stated in Article IX of its Constitution, relating to affiliated associations. . . . Here, there have been 'such contacts of the corporation with the state of the forum as to make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there.' [Citation.]"

In the case at bench, as in *Mechanical Contractors Ass'n,* not only was Institute carrying out the precise activities for which it was organized, which is an indication it was doing business in California, but also it performed an act outside California that had a very pronounced effect in California, the result of which was clearly foreseeable.

It is uncontroverted that Institute is engaged in encouraging and promoting the use of perlite ore in California and in other states and countries. Institute's dues from members are determined by the tonnage of perlite ore used by each member annually; thus Institute's income is directly related to its promotional services. The more it encourages and promotes the use of perlite the greater its income from members. Institute sends out a bulletin every month or two, listing patents that have been granted on a new product that would use perlite, so that members can attempt to sell the product to this new market. It makes available to members information with regard to potential purchasers in each member's geographical area. Clearly it is engaged in a course of conduct from which it derives substantial revenue from services rendered

in California, even though it is done almost exclusively by mail communication.

The aforementioned contacts must also be considered in relation to Institute's other activities which, if Martinez' allegations are proven, have a very definite impact on California and its residents. The allegation is made by Martinez that the processing of perlite can be dangerous to employees working for members of Institute who rely on it to keep them informed of perlite's dangerous qualities. Allegations of Institute's negligence in this regard and proximate cause are also pleaded.

Based on the record before us it is not unreasonable to conclude that Institute is performing duties that normally would be performed directly by Redco. Redco employed no industrial chemist to test perlite ore for dangerous toxic substances, nor used any other means for discovering such substances. Instead, Redco's president admitted it relied to a great degree on Institute, along with others, for this information. Redco's reliance was based on tests of its ore sponsored and paid for by Institute, along with Institute's conclusions set forth in its letter to Redco of February 5, 1971 (see fn. 1, *supra*). Further, Institute acted as a clearing house for information connected with the uses and nature of perlite, and in this connection conducted a survey among its members to determine if they knew of any pulmonary illnesses caused from the use and processing of perlite. The results (showing no reported illnesses) were disseminated to all members. Redco's president knew of no other studies on this issue. We agree with Martinez' argument that the record permits the reasonable inference that one of the reasons for the dues being based on the amount of perlite used is to directly fund Institute's activities from sales of its principal product. The dues enable Institute to perform the services named and to conduct research into the dangers of using and processing perlite ore. As to the latter service, there is evidence that Institute has accepted the testing of the ore as one of its responsibilities. Having done this it is reasonable for it to believe that its members will rely on the tests. If they are negligently performed so that perlite is processed by its members without safeguarding the health of their employees, the injuries to the employees proximately caused by this negligence would occur *only* in the member's locale, which in most instances is outside the State of New York.

A state can exercise judicial jurisdiction over a foreign corporation which causes effects in the state by an omission or act done

elsewhere with respect to causes of action arising from these effects. There are three possible situations: (1) the act was done with the intention of causing effects in the state; (2) the act, although not done with the intention of causing effects in the state, could reasonably have been expected to do so. (The third situation is not germane here). (See West's Code Civ. Proc. Ann., § 410.10, Judicial Council com. p. 472.)

The aforementioned testing program of Institute falls within category (1) or (2). It solicited Redco by mail to participate in the program sponsored by it. Redco accepted by shipping ore samples to a laboratory selected by Institute. The results were forwarded by Institute to Redco with its own letter also setting forth pertinent free silica statistics lifted from the report. The president of Redco testified his corporation relied on the test results and the letter as meaning there were no harmful substances in Redco's perlite ore. Consequently, no steps were taken by Redco to protect its employees from what Martinez now claims was dangerous perlite dust. Redco's conduct in this regard was a foreseeable consequence of Institute's alleged negligent act. Thus the act may have been done with the intention of causing effects in California; or, if not done intentionally, it could reasonably have been expected to do so. In either case the state may cause the same judicial jurisdiction over the actor, as to causes arising from these effects as it could have exercised if these effects had resulted from an act within its territory. (See West's Code Civ. Proc. Ann., § 410.10, Judicial Council com., *supra.*) We are satisfied that this act, coupled with Institute's services previously delineated, are sufficient "minimum contacts" in California so that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." (*Internat. Shoe Co.* v. *Washington, supra,* 326 U.S. 310, and *McGee* v. *International Life Ins. Co., supra,* 355 U.S. 220.) We also believe for the reasons stated above that the acts are of the requisite quality and nature to meet the test spelled out in *Buckeye Boiler Co.* v. *Superior Court, supra,* 71 Cal.2d 893, and clearly Martinez' cause of action arises out of Institute's forum-related activity. *(Buckeye Boiler Co., supra.)*

The tests delineated in *Fisher Governor Co.* v. *Superior Court, supra,* 53 Cal.2d 222 are also met. (1) California has a substantial interest in providing a forum to the plaintiffs, all of whom are Los Angeles County residents; especially if they suffered serious physical injury here. (2) Probably a preponderance of the evidence is here. The perlite ore used by Redco is mined largely in California. Martinez and his fellow

employees worked at Redco's California plant, and determination of toxic substances in the atmosphere of that plant must be made here. Martinez was examined and treated by medical personnel in California. (3) Other defendants (suppliers of ore) are California corporations that must be sued here. Compelling Martinez to sue in New York would result in a multiplicity of suits. (4) Martinez, as a working man with a limited income, could not reasonably be expected to pursue his claim in New York. (5) The cause of action arose out of Institute's activities in California as discussed *supra*.

The order quashing service of summons is reversed.

Kaus, P. J., and Stephens, J., concurred.